NOTICE
Decision filed 12/03/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240835-U

NO. 5-24-0835

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-CF-1266 |
| | ) | |
| DRELYN O'NEAL, | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Cates and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction is affirmed where the State presented sufficient evidence to sustain the convictions for first degree and attempted first degree murder, the alleged errors did not deprive defendant of due process either individually or cumulatively, and defense counsel did not provide ineffective assistance of counsel. Defendant's sentence is also affirmed where it was not excessive and the jury found that the State proved defendant discharged the firearm that killed one victim and caused great bodily injury to the other.

¶ 2    Defendant, Drelyn O'Neal, files a direct appeal from his convictions for murder and attempted murder. On appeal, he contends that (1) there is insufficient evidence to sustain his convictions, (2) individual and cumulative errors caused a deprivation of his due process rights, (3) defense counsel provided ineffective assistance, and (4) his 85-year sentence was excessive. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     On October 6, 2021, defendant was charged, by information, with four counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) related to the death of Demeshiona Fonville (counts I-IV), one count of attempted first degree murder (*id.* § 8-4(a), (c)(1)(D)) related to Diondriss Bond-Washington (count V), and one count of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)) (count VI). The charges stemmed from a drive-by shooting that occurred on September 19, 2021, at which time Demeshiona and Diondriss were sitting in a parked car. It was ultimately determined that five people were in the vehicle from which the shots were fired. The five people included defendant, Quantarius Beasley, Bryan McGee, Cheyenne Bowman, and her sister, Celeste Bowman.

¶ 5     On May 10, 2024, defense counsel filed a motion *in limine* containing eight issues. The four relevant here requested the court (1) preclude any testimony, evidence, or reference to the round of ammunition found in a child's bedroom; (2) deny admission of any autopsy photographs; (3) preclude any testimony regarding "[a]ny other guns other than the gun used in the murder"; and (4) preclude testimony from codefendant, Quantarius Beasley. As to Quantarius's testimony, defense counsel filed a separate memorandum and claimed that Quantarius was the driver of the vehicle involved in the same shooting for which the defendant was charged. The defendant further argued that Quantarius had named the defendant as the shooter during a plea hearing with an offer of 10 years' incarceration to be served at 50% if he testified truthfully at defendant's trial. The defendant claimed that during Quantarius's police interview, he gave statements indicating that Bryan McGee was the shooter and claimed that the police coerced Quantarius to change his prior statements to now testify that defendant was the shooter. Defense counsel's argument also relied on police interview statements from Celeste and Cheyenne Bowman who initially failed to identify

2

Bryan as a passenger in the car. Defendant's memorandum further alleged that DNA testing found Bryan's DNA on the cartridges taken into evidence at the crime scene.[1]

¶ 6    A hearing was held on May 10, 2024, to address the motions *in limine*. As to the issues raised in this appeal, the court granted the motion as to the round found in the child's bedroom after the State indicated it had no objection to that request. The court denied the motion *in limine* as to the autopsy photographs after the State argued that only a few photographs would be utilized and defense counsel stated it was just "making a broad objection" because counsel did not know what would be offered. After hearing argument related to Quantarius's plea deal, the court denied the motion *in limine* but stated it would allow defense counsel wide latitude in Quantarius's cross-examination.

¶ 7    Defendant's trial began on May 13, 2024. The State reminded the court that count VI was previously severed and advised that it planned to proceed on counts III (first degree murder as to Demeshiona) and V (attempted murder as to Diondriss). The remaining counts were dismissed. Defendant's trial took place over four days, and the relevant testimony and exhibits revealed the following.

¶ 8    Detective Clayton Zilz of the Decatur Police Department received a report at 3:23 a.m. of shots fired in the 1400 block of East Walnut Street and responded to the scene. He approached a vehicle and observed two gunshot victims. There was a male in the driver's seat and a female in the back seat. Detective Zilz stated he saw shell casings at the scene. Body camera videos from Detective Zilz and Officer Vail, an officer who also responded to the scene, were published to the jury with no objection by defense counsel.

---

[1]Evidence at the trial revealed that none of the cartridges were tested for DNA.

¶ 9    Detective James Wrigley of the Decatur Police Department took photographs and processed the crime scene on Walnut Street. The photographs revealed shell casings found at the scene and the vehicle in which the victims were sitting. On cross-examination, Detective Wrigley testified that he recovered four shell casings from the victims' car that were sent to the Illinois State Police Crime Lab.

¶ 10    Officer Jaime Hagemeyer of the Decatur Police Department also responded to the scene. Officer Hagemeyer interviewed witnesses at the scene, one of whom provided a description of the vehicle from which the shots were fired. Officer Hagemeyer provided that information to other officers investigating the crime.

¶ 11    Detective Jason Danner of the Decatur Police Department was the lead detective in this case. He testified that he was provided with information from a Flock license plate camera for a vehicle similar to that described by witnesses that was seen in the area of the homicide. Detective Danner tracked the vehicle, which was a red Chevrolet Impala, to its owners Delvan and Cynthia Bowman, the grandparents of Cheyenne and Celeste Bowman. Officers proceeded to the grandparents' home in Argenta, Illinois, around 7 or 8 a.m. the same day as the homicide.

¶ 12    Detective Eric Matthews of the Decatur Police Department accompanied Detective Danner to the grandparents' residence in Argenta, Illinois, and located the red Chevrolet Impala. Upon a visual inspection of the vehicle, Detective Matthews found and collected a spent .40-caliber bullet casing from the rear passenger side that was lodged between the rear window and the deck lid on the car. While at the scene, Detective Matthews also spoke with Celeste and Cheyenne Bowman. The girls identified their phones that were sitting on the kitchen table and provided consent to search their devices.

4

¶ 13     Detective Danner confirmed that a spent .40-caliber cartridge was found on the trunk lid on the rear passenger side of the Chevrolet Impala. Cheyenne and Celeste were at their grandparents' home, and Danner attempted to talk to them. The girls admitted that the vehicle was driven earlier and they provided the names of the driver and another person who was in the car. Celeste provided the names of Quantarius and defendant. She did not mention Bryan McGee at that time. Both girls identified Quantarius as the driver and defendant as the shooter. They stated defendant was in the rear passenger seat of the car during the shooting.

¶ 14     Following the interviews with Celeste and Cheyenne, Quantarius was arrested and interviewed. Quantarius identified himself as the driver of the car and identified both defendant and Bryan McGee as being inside the car. Detective Danner obtained an arrest warrant for defendant and, following his arrest, a search warrant was obtained for the residence where defendant was taken into custody. Defendant's girlfriend, Anysia Brown, lived at the residence. Detective Danner stated they were still looking for the weapon used in the homicide so the search warrant was for anything firearm related, phones that might have evidence of the crime, and anything else that could corroborate witness statements. He stated that Quantarius's residence was also searched. Detective Danner's interview with defendant at the police department's interview room was admitted and published to the jury.

¶ 15     At the police interview, defendant waived his *Miranda* rights and agreed to talk to the officers. Defendant stated that he drove his brother's white BMW truck to his grandmother's house around midnight Saturday night. He stated that he did not leave the house again until the following morning sometime after it was already daylight. He stated that his grandmother, daughter, and his girlfriend Anysia Brown were at the house with him from midnight to sometime after 8 a.m. on

Sunday. He confirmed that Anysia's residence was at Timber Cove where he was arrested and that he had heard about the shooting.

¶ 16     Defendant was asked if he would be surprised to know that he was on video at a gas station right before the shooting happened despite defendant saying he never left the house after midnight. Defendant stated that "he had to think." He then remembered going to the gas station with a friend and two other people whose names he could not recall. He was unsure if they were male or female and explained that one person was a friend of a friend, and he did not know that person. Defendant stated that after they left the gas station, he was dropped off at his other grandmother's house. He provided his grandmother's name and address. Thereafter, defendant clarified that there were two girls in the car. He stated that he did not know who owned the car but that it was dark red. He stated that Quantarius was driving the car. Defendant did not hear Quantarius use the girls' names and stated they did not go anywhere in between the gas station and his grandmother's house.

¶ 17     Defendant stated that he heard about the shooting from his girlfriend who said it was on the internet. He did not know who was shot. After a brief portion of the interview, which is muted, defendant was asked if someone told him that he was a suspect and he said, "no." He was then asked why he called the sheriff's department to ask if he was "wanted." Defendant denied making that call and did not know if someone else called with that query. He offered to let the officers look at his phone and confirmed that one of the phones found in Anysia's apartment was his. Defendant was told that multiple people identified him as being the shooter. Defendant denied that accusation.

¶ 18     Defendant was told that officers were going to execute a search warrant at Anysia's apartment. When asked if they were going to find any guns or ammunition, defendant said, "no." He was not sure if other cell phones would be found. Defendant said there used to be surveillance

6

in the house, but it was no longer there. He stated that he did not shoot at the car accidentally; he did not shoot at the car at all. He had no idea why four people stated he was the one who was the shooter. He stated he was never on Walnut Street and that his phone's location data would not show he was there either. Defendant provided consent to search his flip phone but stated the iPhone was not his so he could not give consent for that phone. He said that the other people in the car who said he was there were lying. After another brief, muted section, defendant was asked what the deal was with the war between the south and the east and defendant shrugged his shoulders and said he did not know. He did not know if it was all about Antoine and stated he was not out there for that situation and did not know who was involved with that either. Following a third muted section, defendant talked about an injury across the front of his neck. He was asked what his family would say when asked about his whereabouts and he said they would say he was home. He was then asked if his family members were willing to go to jail and he said they would not go to jail because they did not do anything wrong. He again stated he did not know the girls in the car and did not know if Quantarius knew them. He stated that he thought he would recognize them by picture but did not know them personally. The conclusion of the video showed the officers ending the interview and leaving the room.

¶ 19    After providing his experience in cell phone data extraction, Detective Matthews testified that he did a full-file systems extraction on Celeste and Cheyenne's phones. He stated that he focused on the track location data and, in preparation for trial, prepared a video map showing the cell phone movement for 9½ hours from 10:30 p.m. on September 18, 2021, to 7:30 a.m. on September 19, 2021. Detective Matthews agreed that the two phones were basically in the same location the entire time. Following the murder, the cell phones went to Stuart Street. The video map of cell phone movements was played for the time period from 3 a.m. to 3:25 a.m. During that

7

time the cell phones were at the location where the shooting occurred. Detective Matthews testified that he also obtained video surveillance from Huck's which was admitted into evidence.

¶ 20    On cross-examination, Detective Matthews clarified that he worked with Detective Danner throughout the investigation, and Detective Danner was the lead detective. Detective Matthews gathered the evidence at the directive of Detective Danner. He stated that with regard to the cell phones, he did not analyze the text messages; he only analyzed the location data. He was never asked to analyze the text messages and did not know if that was done by other officers. He agreed that he found the shell casing but did not personally send it for DNA testing as that was the lead detective's decision. He agreed that he interviewed Cheyenne who told him there were four people in the car and only provided her sister's name during the first interview. Cheyenne told him that one of the unknown individuals was driving and the other unknown individual did the shooting. He believed the girls were covering up for someone. He participated in Celeste's interview, and she named Quantarius as the driver.

¶ 21    Officer Ryan Wicks of the Decatur Police Department executed a search warrant at Quantarius's house and stated that Quantarius's mother also provided consent to search the home. During the search, Officer Wicks found a Glock handgun case and a loose steel case handgun round in the basement inside a suitcase. Officer Wicks testified that Sergeant Marquis found an extended magazine for a pistol inside the residence as well. The magazine was found in Quantarius's bedroom, and the evidence was turned over to Detective Larner.

¶ 22    Detective Steve Young of Decatur Police Department searched the apartment where defendant was taken into custody following his arrest. Detective Young testified that the apartment had two bedrooms, one of which appeared to be a child's bedroom, and a live Luger 9-millimeter round was found in that room. Defense counsel objected based on the prior motion *in limine* ruling

8

and a side bar was held. Following the side bar, the jury was directed to disregard the officer's prior statement. Detective Young then testified that a 9-millimeter Taurus handgun, a .40-caliber SIG SAUER P250 handgun, and an Anderson AM-15 multi caliber rifle were found in the apartment. All three weapons were found in the south bedroom walk-in closet. The 9 millimeter was hidden in an UGG boot box and the other two firearms were found in a Nike backpack that was in a black plastic garbage bag behind a large return vent on the wall. The firearms were placed into evidence over defense counsel's objection of irrelevancy. Further testimony revealed the weapons were sent for forensic testing at the Illinois State Police Crime Lab.

¶ 23 Following Detective Young's testimony, defense counsel moved for a mistrial based on Detective Young's testimony about the round found in the child's room based on the order *in limine*. The State conceded the error and argued it was an innocent mistake, was not prejudicial, and later testimony would show the recovered weapons were not related to the shell casing recovered at the crime scene. It argued that the limiting instruction was sufficient to cure the error, and a mistrial was too extreme. Following argument, the court denied the motion finding the mistake was inadvertent. Based on the State's proffer of future testimony, it also found the testimony meaningless but admonished the State to be more careful in the future.

¶ 24 Cheyenne Bowman testified that she was the younger sister of Celeste. Cheyenne was asked if she had any knowledge of whether Bryan, Quantarius, or defendant were part of any groups that had problems with other groups in Decatur. Defense counsel objected. The court asked if this was gang-related evidence which was inadmissible except to show motive, and the State agreed that it was. The court overruled the objection and Cheyenne stated that she did not have any knowledge on that issue.

9

¶ 25  Cheyenne testified that she and her sister Celeste came to Decatur because they were planning to go to a party in Springfield that night. They were driving a red Chevy Impala. They went to pick up Bryan at his apartment. They drove to Quantarius's residence on Stuart Street and defendant was with Quantarius when they arrived. Cheyenne stated that everyone got out of the car and hung out on Quantarius's porch for a little bit. She and her sister left to pick up some marijuana and returned to Stuart Street. Sometime later, all five people left Stuart Street in the Impala. Quantarius was driving. Celeste was in the front passenger seat. Bryan was in the left back seat, Cheyenne was in the middle of the back seat, and defendant was in the right back seat. They drove to U Top, which was a club, and stayed for about 10 minutes. They headed back to Stuart Street, met a friend on Franklin Street, and eventually went back to Stuart Street. Later that evening they went to Huck's gas station, but no one went into the gas station, then went to Walnut Street. She stated that everyone was in the same position in the car. They drove down the street and Quantarius turned the car around. He then drove past a car that was parked on Walnut Street that was closest to the passenger side of the vehicle Quantarius was driving. Cheyenne testified that defendant lowered his window, shot at the vehicle, and then they pulled off. She did not remember how many times defendant shot but thought it was maybe three or four shots. After the shooting they returned to Stuart Street and defendant got out of the vehicle. They then dropped Quantarius off at his house and Bryan at his apartment. She and Celeste then met a friend on Olive Street, told him what had just happened, and then got high. Thereafter, she and Celeste went back to their house.

¶ 26  On cross-examination, Cheyenne agreed that she had spoken with people recently to refresh her memory. She stated that this was the first and only time she was in a car when someone was shooting from the vehicle. She could not recall everything that occurred in the 3½ hours

10

between the shooting and her returning home. She stated that she was 100 percent sure the shots came from "the right side of the car." She disagreed that she ever said she did not see the shots fired. She could not recall if she told any officer that she saw the shooting and did not recall stating that she ducked when she heard the first shot. She said the shooter did not shoot over the car. She could not remember if she mentioned Bryan to the officers during her first interview. She further stated that she was not sure if she was arrested because she did not provide Bryan's name to police but agreed that she was arrested as a suspect in the murder because the police said she did not tell them the truth. She could not remember what she told police the first time they came to talk about the murder. She agreed that she knew Bryan was in the car at the time of the shooting and stated that the shots came from her right, directly behind her sister. Cheyenne stated that she was shocked after the shooting and had never been in a car shooting before then.

¶ 27 Celeste Bowman also provided testimony at the trial and was also asked if she knew if Bryan, Quantarius, and defendant were part of any groups that had problems with other groups in Decatur and in response stated, "Not 100 percent." Celeste's testimony was similar to that of Cheyenne up to the point where they picked up Bryan, Quantarius, and defendant. The placement of the parties in the car was also the same as Cheyenne's testimony. Celeste's testimony differed in stating that both she and Celeste went into the Huck's and could not recall if they went to purchase marijuana that night. Celeste's testimony also stated that when the five of them first left Stuart Street, they went to defendant's mother's house. At that time, defendant got out of the car, went into his mother's house, and later returned and got back in the car. She stated that defendant had two guns with him when he got back in the car. She stated that after defendant got the guns, they drove to the U Top club to get ecstasy Her testimony also differed from Cheyenne's by stating they stopped on Franklin Street after the shooting.

11

¶ 28    As to the actual shooting, Celeste testified that around 3:15 a.m., they headed over to Walnut Street. They drove down Walnut Street and did a U-turn by the Low End. After turning the car around, they drove past a car parked on Walnut Street, and she heard gunshots. Celeste said they "were at a roll" when the shots were fired. She stated that the shots came from behind her and she heard the window open. She confirmed that defendant was in the seat behind her. She thought she heard "maybe six" shots. She said that Bryan, Quantarius, and defendant clapped after the shots went off. After the shooting, defendant was dropped off at Stuart Street, Bryan at his apartment, and Quantarius at his house. Thereafter, Celeste and her sister went up a block and smoked with a friend for about 30 minutes and then went home.

¶ 29    On cross-examination, Celeste admitted being involved in a second, later-occurring shooting. She stated that she did not know who did the shooting in the second incident, but she was shot in the face, leg, and shoulder. Celeste stated that she was not in a gang. She agreed that when she returned home, she did not call the police and say, "Here's the shooter you're looking for right there, we dropped him off." She agreed that two policemen later arrived at her house. She agreed that she lied to the officers when she told them what happened by saying there were four people in the car, not five. She did not tell the officers that Bryan was in the car. She disagreed that she was afraid of Bryan. She confirmed that police returned the following day, charged her with murder, and she sat in jail for a few days. She stated that Bryan was not the shooter but agreed that Bryan was at least a witness. She confirmed that after spending a few days in jail, she contacted police and told them she wanted to tell them more about the murder. At that time, she told them that Bryan was in the car. She stated that she was afraid for her life and family. She did not recall telling police that Byran had shot people before. She said she was not certain if Bryan had shot people before.

12

¶ 30　　Quantarius Beasley testified that he was charged with first degree murder in this case and entered a plea deal which provided him with less prison time if he testified truthfully in the current trial. He could not recall whether Bryan and defendant were involved with groups having problems with other groups. Quantarius testified that he met up with Celeste and Cheyenne around 11 p.m. on September 19, 2021, on Stuart Street. They were in a red car. The first time they showed up, it was just the girls. They left at some point and when they returned, they had Bryan with them. Defendant was with Quantarius and the five of them left to get some liquor. Quantarius said he was the driver, and Celeste was in the front passenger seat. Cheyenne was in the middle of the backseat. Bryan was behind Quantarius and defendant was on the passenger side of the backseat. After they got liquor, they drove around, went to the U Top, and then continued to drive around. Quantarius did not remember going to Franklin Street but agreed they stopped at a Huck's gas station. He stated that everyone remained in the same places in the car, and they continued to drive around. When they got to Walnut Street, there was a car parked on Walnut Street that was closest to the passenger side of the car Quantarius was driving. He slowed down when they got closer to the car, and he heard shots coming from the backseat of the passenger side of the car he was driving. He testified that defendant was sitting in that seat. Quantarius stated that he just heard the shots because he was watching the road. He thought he heard five or six shots. He said no one did anything after the shots were fired but he sped up to leave the area. He went back to Stuart Street, and everyone got out of the car and was "just chilling there for a little bit." Eventually, Quantarius, Bryan, and the girls returned to the car. Quantarius drove the car to his home and exited the vehicle. Bryan and the girls then left in the vehicle.

¶ 31　　On cross-examination, Quantarius explained his plea deal in which he was offered 10 years' incarceration which was to be served at 50% if he testified truthfully at defendant's trial.

13

He agreed that the "truth" was based on what the state's attorney and police believed was true. He did not know if his current testimony was different from what he previously told the police but agreed he did not want to ruin his deal. He said the officers that initially presented at his house were "street crime people" who dressed in plain clothes. He agreed that his statement to the police was video recorded and that his memory was fresher at that time since the incident occurred the day before and it was now three years later. He disagreed that he told the officers that he saw Bryan McGee lean out of the car window and shoot over the car and said he would be surprised to see himself say that on the video recording. When asked if he would like to be surprised and shown the video, Quantarius said, "No."

¶ 32    He stated that when he was questioned, the police officers were talking about defendant and did not mention Bryan McGee. He was surprised that Bryan's name had not come up. He again disagreed that he told the officers that Bryan leaned out the car window and fired across the Impala into the parked car. He also stated that Bryan directed him where to go. Quantarius stated he did not know Bryan was going to shoot anyone before the incident. He then disagreed that Bryan told him where to drive, stating, "I knew where to drive." He further disagreed that he told police that Bryan was the only person with a gun. He stated he would be surprised if he told the police that because he did not say that. He stated that nobody showed him the video from his first interview with the police before giving him the plea deal. He agreed that he later stated that defendant was the shooter.

¶ 33    Quantarius was provided a copy of the alleged videotape from the police interview. He refused to identify the video stating that he wrote on the outside of the video, and this one did not have his handwriting or signature. He stated that he later wrote an affidavit that his prior statement was false and did not understand his rights. When asked what statements were false, he stated that

14

he was talking about "being there and about the shooting." He agreed that some of his statements about the shooting were lies. On redirect, Quantarius stated that his testimony in court about what happened on the night of the shooting was truthful.

¶ 34   Nataniel Patterson testified that he was board certified in anatomic, forensic and pediatric pathology. After explaining his education, experience and qualifications, he stated that he performed Demeshiona's autopsy. As part of the autopsy, Dr. Patterson took photographs of Demeshiona, and she had two gunshot wounds to the head. He also recovered projectile fragments from her forehead wounds. The State moved to admit two autopsy photographs. Defense counsel objected, stating the photographs did not say anything about who did the shooting and therefore were prejudicial. The State argued that the photos showed valuable information about the entry wounds. The court overruled the objection, stating that there was an issue of cause of death that the photos would explain. The physician explained Demeshiona's bullet wounds shown on the photographs and they were admitted into evidence. At that time, defense counsel stated that his objection was solely related to publication of the photographs to the jury. The objection was again overruled. Dr. Patterson also addressed photographs of the projectiles found and removed during the autopsy. No objection to admission of the two photographs of the bullet fragments pulled from the victim was presented and those photographs were also admitted and published to the jury. Dr. Patterson stated that the bullet fragments were "centerfire" ammunition but not from a shotgun. He further stated the fragments were larger than a .22 caliber. He was not able to determine how far away the shooter was from the victim but stated no gunpowder or stippling was found on the victim. He testified that Demeshiona died from a gunshot wound to her head.

¶ 35   Vickie Reels testified that she was a forensic scientist employed by the Illinois State Police Forensic Science Command. She specialized in firearms, footwear, and tire track evidence. After

addressing her education and experience, she explained firearm identification. She analyzed two bullets and four shell casings found in this case. She opined that the cartridge cases all came from the same firearm and were .40 Smith & Wesson caliber. One of the bullets was unsuitable for comparison but the other was consistent with a .40 caliber and was fired by the same gun that produced the four cartridge cases. She analyzed the .40-caliber SIG SAUER firearm found during the investigation and determined the weapon did not fire the casings she analyzed. She stated that she was also provided other firearms to analyze but since they were not .40-caliber weapons, she did not need to microscopically examine those weapons and eliminated them as possible weapons that fired the bullets and shell casings found in the case.

¶ 36 Detective Danner testified that three people named defendant as the shooter. He stated that security video was obtained from the Huck's gas station at the Five Points intersection and that he reviewed that video. The gas station video for the time between 1:35 a.m. and 1:51 a.m. was published to the jury. The video revealed that a red vehicle stopped at the gas station pumps, the occupants alighted from the vehicle, and the female occupants went into the gas station and entered the bathroom. When the females returned to the vehicle, everyone entered the vehicle, and the vehicle drove away. The detective stated that they also reviewed video from the Low-End Exchange, which was a corner convenience store near Walnut Street. A stipulation regarding the Low-End Exchange's manager, Salah Alkabsh, was read to the jury about the video recording system at that business. The video from Low-End Exchange was published to the jury. The video was a "zoomed in" version of the footage. Detective Danner identified the parked vehicle shown as the victims' vehicle and later identified the other vehicle as the suspect vehicle, which was the red Impala. The officer agreed that the police showed up approximately five minutes into the clip. The video showed the victims' vehicle parked on the side of the street with a second car coming

16

by later that drives past the victims' vehicle. He opined that the flashes seen in the video were likely damage coming off the victims' vehicle or the actual bullets.

¶ 37     Detective Danner also testified that the murder weapon was never recovered, even after searching places where witnesses claimed the weapon was left. He stated that DNA and latent prints were requested from some of the evidence, but the findings were unhelpful to the investigation. He confirmed that neither prints nor DNA were requested for the shell casings. He stated that at the time of the incident, the Illinois State Police Crime Lab had protocol which did not accept cartridge casings for DNA and fingerprints. He stated that the cell phone data from Celeste and Cheyenne's phones as to the location data corroborated their statements. Quantarius's phone and defendant's phone were both recovered and extracted but provided no useful information. He stated that GPS data was not available from defendant's flip phone.

¶ 38     The State asked the detective to provide his analysis of the evidence. Defense counsel objected but the objection was overruled. As the lead detective in the case, Detective Danner then analyzed how all the information was put together. He started at the crime scene on Walnut Street and stated that the casings in the street matched the casing found on the trunk lid of the red Impala. He stated that the last interviews of Quantarius, Cheyenne, and Celeste were consistent in stating that defendant was in the rear passenger seat, rolled down the window, and shot out the window. He also addressed the location data from the cell phones and the video from Low-End Exchange showing the car driving by, slowing down, and projectiles being fired or damage coming from the car. He stated that during defendant's police interview—in which defendant initially claimed an alibi—defendant eventually admitted that he was in the red Impala with the two girls and Quantarius which was confirmed by the gas station video surveillance. Defense counsel moved to strike the detective's testimony, but the motion was denied.

17

¶ 39    On cross-examination, Detective Danner agreed, as lead detective, that if some part of the investigation was incomplete, he had the authority to proceed to have it completed. He conceded that the rifle that was placed into evidence had nothing to do with the case, a cartridge was sent to the crime lab for testing and analysis, and that he learned Quantarius was the driver from Cheyenne and Celeste. He also admitted that an important investigative lead was CODIS, which was a large DNA database. He acknowledged that a firearm and magazine recovered during the investigation were sent to the lab, a CODIS hit was made, and Bryan McGee's DNA profile was found on that firearm. He stated that once the weapon was determined not to have been used in the murder, the lead regarding Bryan was no longer relevant. He further stated that the firearm did not match the shell casings that were found at the scene on Walnut Street. Detective Danner disagreed that the firearm, which was included in the evidence, created an implication that the weapon was defendant's gun.

¶ 40    Detective Danner identified the spent .40-caliber Smith & Wesson casing from an unfired firearm. He agreed that it was the same caliber as the five casings recovered and placed into evidence. He did not know if it was a different manufacturer. He stated that one of the casings was recovered from the red Impala by Detective Matthews. He did not think it was odd that the casing remained on the car in the crease between the window and the trunk lid although he conceded that it could have come off easily.

¶ 41    Detective Danner admitted that the murder weapon was never recovered after searching what they believed to be defendant's residence, as well as Quantarius's residence. They did not search the residence of Celeste and Cheyenne Bowman. He stated that Bryan McGee was later arrested in Chicago and was also charged with murder. The detective conceded that the missing murder weapon could have been located at the Bowman residence or with Bryan in Chicago.

18

Detective Danner agreed that Quantarius initially stated that Bryan McGee had the gun and was the shooter. Quantarius then stated that he thought both Bryan and defendant had guns. When asked why he originally said the shooter was Bryan, Quantarius stated that he assumed Bryan was shooting too. Detective Danner agreed that only one gun was used during the incident based on the forensic evidence. He stated that the girls' grandfather found a shell casing in the car and threw it away. The witnesses at the scene indicated there was one shooter from a red Impala, and that no DNA or fingerprints from defendant were found in connection with the crime. He agreed that the casings were not tested pursuant to Illinois State Police Crime Lab protocol and there was no cell phone evidence that connected defendant to the crime.

¶ 42    On redirect, Detective Danner explained that the firearm that was sent to the lab was sent because it was the same caliber as the casings at the scene. He further stated that Quantarius gave several different versions of what happened on the night of the shooting. He stated that it was not uncommon for people to change their statements. He interviewed Celeste three times, and she eventually stated that defendant was the shooter. She never stated that anyone else was the shooter. Cheyenne was also interviewed three times, and she also stated that defendant was the shooter and never changed her statement on that issue. Detective Danner stated that there were other people in the victims' car, and they stated there was only one shooter.

¶ 43    On recross-examination, Detective Danner agreed that both girls named defendant as the shooter. The detective was not familiar with any text or email between the girls stating that defendant was the shooter. He agreed they had five hours between the time of the shooting to the first interview to talk and discuss who was the shooter. He further agreed that Celeste stated that Bryan made a comment in the car that "they always pulled up on the wrong side."

19

¶ 44    Following Detective Danner's testimony, the State rested. Defense counsel moved for a directed verdict, which was denied. The court inquired as to whether defendant was planning to testify, and defendant advised that he was not going to testify.

¶ 45    Defense counsel called Amanda Humke who was a forensic scientist employed with the Illinois State Police Springfield Forensic Science Laboratory. After addressing her education and experience, Ms. Humke stated that she issued a CODIS hit report in the case with regard to a .40-caliber gun and magazine found in defendant's apartment. She explained that CODIS was a DNA profile database and if there was a match between the evidence and a person, a CODIS match report was issued to the lead detective. Ms. Humke testified that there was a CODIS match between the .40-caliber gun and magazine to Bryan McGee.

¶ 46    Kelly Maciejewski was also employed as a forensic scientist with the Illinois State Police Forensic Science Laboratory in Springfield. After addressing her education and experience, Ms. Maciejewski explained that she received multiple pieces of evidence and collected swabs from a 9-millimeter weapon, a .40-caliber weapon, and a rifle, and conducted DNA analysis to develop DNA profiles from that evidence. She found usable DNA profiles from the 9-millimeter and .40-caliber weapons. Neither of the DNA profiles connected to those weapons were connected to defendant. She stated that Quantarius was connected to the 9-millimeter weapon and Bryan McGee was connected to the .40-caliber weapon. The court then asked for clarification as to whether the testimony just provided by Ms. Maciejewski about the 9 millimeter was the 9 millimeter from the UGG box found in defendant's girlfriend's closet. The State confirmed it was.

¶ 47    Following Ms. Maciejewski's testimony, defense counsel rested, and the State indicated it had no rebuttal evidence. The jury was instructed on the law and began deliberations. Following deliberations that continued into the next day, the jury found defendant guilty of first degree

20

murder of Demeshiona, and the State proved that defendant personally discharged a firearm that proximately caused Demeshiona's death. The jury also found defendant guilty of attempted first degree murder as to Diondriss and that the State proved defendant personally discharged a firearm that proximately caused Diondriss's great bodily harm.

¶ 48 On June 14, 2024, defense counsel filed a motion for a new trial. The motion claimed the evidence was closely balanced and listed the following errors: (1) there was a direct violation of the motion *in limine*; (2) portions of the motion *in limine* were improperly denied; (3) the repeated use of the on-site video resulted in prejudice outweighing the probative value; (4) the court allowed perjured testimony by Quantarius; (5) the lead detective, Danner, committed perjury; (6) the lead detective, Danner, mischaracterized Celeste's testimony; (7) the police were aware that Celeste and Cheyenne were protecting the obvious guilty party, Bryan McGee; (8) the perjury allowed for a "creation of a case" against defendant; (9) the denial of defense counsel's cross-examination of Detective Danner to "illustrate how he had failed to investigate all leads"; and (10) denial of the modified accountability jury instruction 5.03 submitted by defense counsel.

¶ 49 The presentence investigation report was filed on June 25, 2024. Defendant's only prior adult conviction was for aggravated discharge of a firearm/vehicle/school on October 18, 2021. Defendant's juvenile record included one count of obstruction justice/destruction of evidence on May 23, 2017. The report also revealed that defendant's parents were never married, and defendant was raised by his mother along with four siblings. Defendant stated his father was his best friend. Defendant was single, unmarried, and had a daughter born in 2020 who resided in Peoria. Defendant graduated from high school in Kentucky in 2019 and his last employment was at Tommy Tires, where he worked part time in 2019-2020. He received unemployment in the seven

months prior to his arrest. Defendant stated he was shot in the back in 2020. He denied any drug or alcohol issues.

¶ 50    The motion and sentencing hearings were held on July 2, 2024. No argument was presented by defense counsel regarding the motion for a new trial, and the trial court found that the evidence was not closely balanced. The court did not recall any *limine* order violation. It found the on-site video was important for the attempted murder count, stated defense counsel was given wide latitude during cross-examination of Quantarius, and found the accountability instruction was inappropriate based on the facts and circumstances. The court found the remaining issues were factual issues for the jury and denied the motion for a new trial.

¶ 51    The court moved to the sentencing hearing and confirmed there were only two counts, both of which had enhancements. The parties agreed that the first degree murder charge would be served at 100% and the attempted murder charge would be served at 85%. Defense counsel submitted a memorandum requesting appointment of an expert witness and counsel argued that in order to determine whether defendant should be treated as a young adult as opposed to a full-fledged adult, an expert witness was required. The State argued that defendant was a legal adult and appointment of an expert would be inappropriate. The court denied the motion, stating that defendant was 20 years old at the time of the shooting and was now 23 years old. The court stated it would consider defendant's "relatively young age in attempting to fashion a sentence in this particular case."

¶ 52    The State presented two victim impact statements. Nizerriyah Ash read a statement on behalf of Demeshiona's mother, Ebony Fonville. The State also read a victim impact statement from Diondriss's grandmother. Defense counsel presented statements from Evelyn Smith, Hannah Henry, Neshia Flagg, and Thalassa Peck, which were read silently by the court, and testimony from defendant's mother, Shirmeka O'Neal, was presented. Ms. O'Neal stated that since

22

defendant's high school graduation, defendant worked, helped around the house, had a daughter that he was helping to raise, and helped her mother and anyone who asked for help. On cross-examination she explained that defendant was in Decatur because his daughter lived there. He was shot in January 2020, so he had doctor's appointments for the bullet wound in his back. Defendant declined the opportunity to provide a statement in allocution.

¶ 53  The State requested life sentences on both charges, which included the firearm enhancements. Defense counsel requested the minimum sentence of 76 years, stating it was already a life sentence. After hearing argument, the court stated:

"The factors I consider to be important is [defendant] was 20 at the time of the shooting is now 23, which is obviously a relatively young age in the Court's opinion. [Defendant] stands convicted of really the most serious offenses—or offenses, murder, the taking of somebody's life, an attempted murder where the individual was seriously maimed in this circumstance and is never going to be able to recover.

I understand—well, I can't fully understand, but I try to understand that the victims' families here have suffered and will continue to suffer. I cannot however impose a sentence based on vengeance. I have said this on many occasions, this is just a—a senseless situation. I don't even know why it occurred.

[The State] tried to explain it, but my best guess is the defendant probably thought there was some imposing member of some gang in his neighborhood and he was going to stop it. And it's just one more instance of just senseless gun violence. [The State] asked in some fashion to impose a sentence that's going to send some type of message to the community. If I give somebody 150 years, people

23

are going to read about it and then there's not going to be anymore gun violence. I don't believe that. Okay.

I think I can do that and it's not going to make any difference, which certainly doesn't make me feel better about the situation, but I don't know why this occurs. I don't know why it continues to occur. But I don't think anything I can do from my position is going to change things. In terms of other factors I consider to be important, again, the defendant is relatively young. He does have some criminal history. He does have his family support. He is a high school graduate.

He has been employed in the past. And finally as [the State] points out, this was about as close as you can come to having a double murder where the minimum sentence is a life sentence."

¶ 54    The court sentenced defendant to 50 years for first degree murder with 3 years' mandatory supervised release. The court clarified that the sentence was 25 years for first degree murder and 25 years for discharging a firearm. He sentenced defendant to 10 years for attempted first degree murder followed by a 25-year firearm discharge enhancement for a total of 35 years. The sentences would run consecutively. Following the imposition of sentence, defendant was advised of his rights to appeal. The State dismissed count VI. Defense counsel advised the court that defendant wished to forego any reconsideration related to his sentence and appeal instead.

¶ 55                                    II. ANALYSIS

¶ 56    Defendant raises numerous issues on appeal, including the sufficiency of the evidence to support the convictions, due process violations related to alleged errors during the trial, ineffective assistance of defense counsel, and an excessive sentence. The State requests affirmation of defendant's convictions and sentences.

24

¶ 58    Defendant first argues that there was insufficient evidence for his murder and attempted murder convictions. In support, he argues that the witness statements were inconsistent and physical evidence suggested that defendant was not the shooter. When a sufficiency of evidence claim is raised, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. This review standard applies regardless of whether the evidence is direct or circumstantial. *Id.* This court does not retry the defendant; we will not substitute our judgment for that of the trier of fact which had the original responsibility of resolving conflicting testimony, weighing the evidence, and drawing reasonable inferences. *Id.* "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 59    Defendant's insufficiency argument is based on contradictory witness testimony related to details in the hours before and after the shooting. However, discrepancies are to be expected anytime several people witness the same event under traumatic circumstances. *People v. Brooks*, 187 Ill. 2d 91, 133 (1999). In the case at bar, the testimony at trial revealed discrepancies that included where the parties went on the evening of the shooting, why the parties visited certain locations, the order of the locations visited, and which parties alighted from the vehicle at the gas station an hour before the shooting. Defendant insinuates that these are "material facts" but provides no argument as to why the discrepancies are relevant when the witnesses unanimously testified that defendant shot the victims from the back right passenger seat of the car. Further, defendant's argument ignores the GPS data from Celeste and Cheyenne's cell phones and gas

25

station video that allowed the triers of fact to determine which testimony regarding the facts prior to and after the shooting was most credible, or at least more reliable, given that three years elapsed between the shooting and the trial.

¶ 60    Defendant's argument also relies on contradictions between initial statements the witnesses provided to police and their testimony at trial. While neither Cheyenne nor Celeste's interviews were placed into evidence, both admitted at the trial that they initially lied to police about who was in the vehicle at the time of the shooting. While Quantarius disputed any differences between his alleged initial interview statements and his testimony, Detective Danner confirmed that Quantarius initially named Bryan McGee as the shooter. Regardless, it was the responsibility of the trier of fact to determine whether the witnesses' prior statements were more credible than the testimony provided at trial. *Jackson*, 2020 IL 124112, ¶ 68 ("It was up to the jury as the trier of fact to determine whether [the witness's] statement was more credible than her subsequent recantation.").

¶ 61    Finally, defendant contends that the "self-contradictions, impeachments, and blatant lies" showed the witnesses were unreliable, and taken together, "evidence a plan to cover for [Bryan] and falsely implicate [defendant] as the shooter." We disagree. While both Cheyenne and Celeste initially failed to advise police that Bryan was a passenger in the vehicle, neither girl wavered in naming defendant as the shooter. Any question of credibility stemming from Quantarius's initial interview naming Bryan as the shooter and his testimony naming defendant as the shooter at the trial was firmly placed before the jury. The question of Quantarius's credibility arising out of his plea deal was also before the jury. The determination of a witness's credibility and weight of evidence are "determinations *** exclusively within the province of the jury." *People v. Collins*, 106 Ill. 2d 237, 261-62 (1985).

26

¶ 62    The State was required to show that defendant either intended to kill or do great bodily harm to another or that defendant knew his acts would likely cause death or great bodily harm to another. See 720 ILCS 5/9-1(a)(1), (a)(2) (West 2020). Here, contrary to defendant's argument, the jury could have easily found that this burden was met where three witnesses unanimously testified at trial that defendant opened the right back passenger window and shot multiple times at Diondriss and Demeshiona, and the forensic evidence showed that all five casings that were recovered were fired from the same weapon. Viewing the evidence in a light most favorable to the State, this court can infer that with the GPS and video evidence submitted, there was a reliable basis for the jury to determine from the witnesses whose testimony was the most credible. Therefore, sufficient evidence existed to support defendant's convictions for first degree murder and attempted first degree murder. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999) ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict."). Accordingly, we conclude there was sufficient evidence to support the jury's verdict.

¶ 63                                B. Cumulative Error

¶ 64    Defendant next argues that cumulative errors deprived him of his due process right to a fair trial. The errors included (1) the State's violation of an order *in limine*, (2) the State's presentation of weapon evidence that "played no role in the shooting," (3) the State and the trial court's suggestion of gang affiliation, and (4) the trial court's admission of "irrelevant and gruesome autopsy photographs." He argues that these errors improperly influenced the jury and encouraged them to decide the case based on emotion, instead of evidence. The State argues that only the first issue was presented in defendant's posttrial motion, no claim of cumulative error was ever raised before the trial court, and no request for plain error was made by defendant. In response, defendant

27

requests review of cumulative error under both prongs of plain error but fails to state which issues were previously preserved.

¶ 65    Our review of the evidence finds that three of the four issues were sufficiently preserved. Only the "gang evidence" issue was improperly preserved because it was not included in the posttrial motion and, therefore, the plain error doctrine will be applied solely to that issue and to the claim of cumulative error.

¶ 66    We first address the properly preserved issues. The first error claims the State violated an order *in limine*. This error was preserved and therefore plain error review is unnecessary. It is undisputed that the State violated the order *in limine* precluding evidence of the round found in the child's bedroom when Officer Young stated that during a search of the first bedroom that was believed to be a child's bedroom, based on clothing and things found in there, the "officer located a live *** Luger brand 9mm round." As such, we agree there was error. However, the trial court immediately struck the testimony and admonished the jury to ignore the statement. Where the trial court admonishes the jury to disregard certain testimony, any possible prejudicial effect on the defendant is typically sufficiently cured. *People v. Wiley*, 165 Ill. 2d 259, 294-94 (1995); *People v. Speight*, 153 Ill. 2d 365, 373 (1992). Here, we find the stricken testimony and immediate admonishment sufficient to alleviate any prejudice and therefore find the error was harmless.

¶ 67    Defendant's second claim of error contends the State's presentation of weapon evidence that "played no role in the shooting" was error. This error was preserved under defendant's posttrial allegation that the portions of the motions *in limine* were improperly denied. Defendant argues that the evidence was irrelevant, and even if relevant, the probative value was outweighed by the prejudice.

28

¶ 68    Defense counsel's motion *in limine* requested the court preclude the State from presenting any testimony or reference to "[a]ny other guns other than the gun used in the murder." The State argued that as part of the police investigation, the weapons found were taken to compare with the shell casings found at the scene. The purpose of the evidence was to show the due diligence by the officers, otherwise "it looks like a very sloppy investigation." The court denied the motion *in limine* and allowed the State to "present testimony as to guns recovered as part of the investigative process."

¶ 69    "Generally, we review a trial court's decision on a motion *in limine* for an abuse of discretion" unless the only issue before the court involves a question of law which then requires a *de novo* standard of review. *People v. Armbrust*, 2011 IL App (2d) 100955, ¶ 6. Here, no question of law is raised, therefore we "consider[ ] whether 'the [trial] court's decision is arbitrary, fanciful[,] or unreasonable, or where no reasonable person would agree with the position adopted by the [trial] court.' " *People v. Conner*, 2025 IL App (4th) 240972, ¶ 21 (quoting *People v. Inman*, 2023 IL App (4th) 230864, ¶ 10).

¶ 70    While the admission of a weapon unassociated with the crime can be found erroneous (see *People v. Smith*, 413 Ill. 218, 223 (1952); *People v. Maldonado*, 240 Ill. App. 3d 470, 478-79 (1992); *People v. Jackson*, 154 Ill. App. 3d 241, 246 (1987)), we cannot hold that it was an abuse of discretion by the trial court to allow the State to present evidence supporting its claim that a thorough investigation was conducted. It is undisputed that bullet casings were found at the crime scene and in the vehicles involved in the murder. The State provided evidence revealing that search warrants were issued, and weapons were found during the searches. More importantly, the State was forced to concede that the weapons obtained pursuant to the search warrants were eliminated as being the murder weapon, and the murder weapon was never found.

29

¶ 71    Moreover, while the weapons were found in defendant's girlfriend's apartment, none of the weapons admitted into evidence were tied directly to defendant. Further, DNA evidence related to one of the weapons was directly linked to Bryan McGee, who defendant claimed was the actual shooter. Given these facts, we cannot find that the prejudice outweighed the probative value (see *People v. Eyler*, 133 Ill. 2d 173, 218 (1989)) or that it was an abuse of discretion for the trial court to deny defendant's motion *in limine* and allow the State to admit the evidence. See *People v. Shum*, 117 Ill. 2d 317, 353 (1987). Accordingly, we find no error.

¶ 72    The third issue that was also sufficiently preserved under the improperly denied motions *in limine* allegation was the admission of two autopsy photographs. Defendant argues that there was no dispute as to the cause of death and therefore the photographs of 17-year-old Demeshiona with bullet holes in her forehead served no purpose other than to encourage the jurors to decide the case on the basis of emotion, rather than evidence. We disagree.

¶ 73    Generally, whether a photograph of the deceased should be admitted rests with the trial court's discretion and if the photograph has sufficient probative value, it may still be admissible despite the fact that the photograph may be gruesome or inflammatory. *People v. Scott*, 148 Ill. 2d 479, 547 (1992) (citing *People v. Lefler*, 38 Ill. 2d 216, 221 (1967)). Here, the autopsy photographs were used during the testimony from the autopsy prosector, Dr. Patterson, who testified that he took pictures of the two gunshots to her head. He stated that one of the bullets entered the skull and went through the brain. In order to distinguish between the wounds, a photograph of the entry and exit wounds illuminated Dr. Patterson's testimony and further supported his testimony about the distance between the shooter and victim. Autopsy photographs are allowed to show the exact location and trajectory of wounds. *People v. Jenko*, 410 Ill. 478, 482 (1951). Therefore, we cannot

find it was an abuse of discretion for the court to admit two autopsy photos, limited solely to the victim's head. Accordingly, no error can be found.

¶ 74 The fourth issue contends that the State and the trial court's suggestion of gang affiliation was erroneous because the State presented no evidence that defendant had ties to a gang. It argues that the State's insinuations had no probative value and were used solely to incite negative suspicion in the jurors' minds. As this error was not preserved, we consider it under the plain error doctrine.

¶ 75 "The plain-error doctrine *** allows a reviewing court to reach a forfeited error affecting substantial rights in two circumstances." *People v. Herron*, 215 Ill. 2d 167, 178 (2005). The first circumstance occurs when a clear and obvious error occurs, and the evidence is closely balanced. *Id.* The second circumstance occurs "where the error is so serious that the defendant was denied a substantial right" in which case the reviewing court considers the "forfeited error in order to preserve the integrity of the judicial process." *Id.* at 179. Second-prong error is equated with " 'structural error.' " *People v. Moon*, 2022 IL 125959, ¶ 28 (quoting *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009)). The Illinois Supreme Court explained that,

> "In defining structural errors, the United States Supreme Court has explained that most constitutional errors can be harmless; if a defendant is represented by counsel and tried by an impartial adjudicator ' "there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." ' " *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 8 (1999), quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)).

Only errors that affect the framework within which the trial proceeds, including "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial,

racial discrimination" in jury selection, or a defective reasonable doubt instruction, rise to the level requiring reversal. *Id.* ¶ 29. The burden of persuasion lies with defendant to establish plain error in claims of both first- and second-prong error. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 76    Here, the record revealed that the State asked Cheyenne and Celeste if Bryan, Quantarius, or defendant were "part of any groups that have problems with any other groups in Decatur." A similar question was posed to Quantarius. Defense counsel objected stating the State was trying "to get into a possible motive." When the question was initially asked, the court questioned if the statement to the group referenced to "gang related evidence" but noted such evidence was inadmissible "except to show motive." The court then overruled defense counsel's objection. The statements of the State and trial court are the basis of defendant's plain error claims.

¶ 77    Generally, "street gangs are regarded with considerable disfavor by other segments of our society." *People v. Strain*, 194 Ill. 2d 467, 477 (2000). As such, we agree that it was error for the State and court to directly use the words "gang related evidence." However, given the unanimous testimony that defendant was the shooter, we cannot find the evidence in this case was closely balanced. As such, we do not find first-prong plain error. Nor can we find second-prong plain error as we cannot find the claim to be a structural error. Accordingly, we classify the error as "harmless" and consider whether the cumulative errors found amount to second-prong plain error.

¶ 78    The cumulative error doctrine applies where individual trial errors do not entitle defendant to relief, but "when considered in the aggregate, 'have the cumulative effect of denying [the] defendant a fair trial.' " *People v. Quezada*, 2024 IL 128805, ¶ 46 (quoting *People v. Speight*, 153 Ill. 2d 365, 376 (1992)). A cumulative error argument within a plain error framework requires the reviewing court to first determine which of the errors actually constitute clear or obvious error and then we determine whether the cumulative impact of those errors " ' "affected the fairness of the

32

trial and challenged the integrity of the judicial process." ' " *Id.* ¶¶ 55-56 (quoting *People v. Darr*, 2018 IL App (3d) 150532, ¶ 51, quoting *People v. Sebby*, 2017 IL 119445, ¶ 50). We have already determined whether error occurred and, therefore, we must now "determine whether the aggregate effect of those errors rises to the level of plain error." *Id.* ¶ 57.

¶ 79    The two errors found in this case involved the *in limine* violation related to the round found in what was believed to be a child's bedroom and the references to alleged gang affiliation. One of these errors was properly preserved; the other was not. As such, this court must determine whether the "cumulative impact of those errors 'affected the fairness of the trial and challenged the integrity of the judicial process.' " *Id.* ¶ 55 (quoting *Sebby*, 2017 IL 119445, ¶ 50). Here, we cannot find that the errors reach this level.

¶ 80    As to the motion *in limine*, "[g]enerally, if a timely objection is made at trial to improper interrogation, the court can, by sustaining the objection or instructing the jury to disregard the question and answer, usually correct the error." *People v. Hall*, 194 Ill. 2d 305, 342 (2000) (citing *People v. Carlson*, 79 Ill. 2d 564, 577 (1980)). As noted above, we did not find this to be a situation where the error was so damaging that the trial court's action could not or did not erase the prejudicial effect.

¶ 81    Defendant claims that the error allowed the jury to convict him based on prior experience with guns. In support, defendant relies on "prior bad act" case law and states that without Officer Young's testimony, "the jury would not have known about [defendant's] past experiences with firearms, or the fact that there were bullets in his child's bedroom." We disagree.

¶ 82    First, the order *in limine* granted by the trial court was limited solely to the round found in the child's bedroom. Further, the stricken sentence was not indicative of defendant's alleged past experiences with firearms. Finally, possession of a weapon or ammunition—without something

33

more—is not illegal or indicative of "prior immoral or criminal conduct." As such, no deprivation of a basic constitutional protection is shown.

¶ 83     As to the gang affiliation reference, none of the witnesses testified that they were aware of any affiliation between defendant and a gang. Indeed, no evidence of gang affiliation was presented during the State's case in chief, and no argument claiming any gang affiliation was presented during closing argument. Given the question, the court's clarification of "other groups" for the jury, and unanimous negative responses related to defendant's alleged gang affiliation, we cannot find that the error deprived defendant of a basic constitutional protection. Even considering both errors together, we cannot find defendant was deprived of a fair trial or that the errors challenged the integrity of the judicial process. As such, we do not find the violations sufficient to grant a new trial.

¶ 84                    C. Ineffective Assistance of Trial Counsel

¶ 85     Defendant also argues that his trial counsel failed to provide constitutionally effective assistance because he failed to impeach Quantarius with video from his police interview in which Quantarius allegedly claimed that Bryan McGee was the actual shooter. Defendant claims that no reasonable trial strategy can account for this failure and, therefore, this court must reverse the judgment and remand the case for a new trial.

¶ 86     A claim of ineffective assistance of counsel is analyzed under the two-pronged test enunciated in *Strickland*. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). Under *Strickland*, a defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness and was therefore deficient, and (2) the deficient performance prejudiced defendant. *Id.* To establish prejudice, the defendant must prove there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*People v. Richardson*, 189 Ill. 2d 401, 411 (2000). "The defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Id.* A failure to satisfy either *Strickland* prong precludes the finding of ineffective assistance of counsel. *Patterson*, 217 Ill. 2d at 438.

¶ 87   "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. West*, 187 Ill. 2d 418, 432 (1999) (citing *People v. Ramey*, 152 Ill. 2d 41, 53-55 (1992)). These types of decisions are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel. *People v. Perry*, 224 Ill. 2d 312, 355 (2007). A defendant must overcome the strong presumption that the challenged action or inaction was the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). This is true even if defense counsel's trial strategy or tactics ultimately failed or was based on an error in judgment. *Perry*, 224 Ill. 2d at 355. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *Id.* at 355-56.

¶ 88   Here, defendant claims that defense counsel "had a powerful tool" in the form of Quantarius's electronically recorded police interview in which Quantarius claimed that Bryan was the actual shooter. He contends that counsel could have used the video to impeach Quantarius and as substantive evidence of defendant's innocence. However, the decision to use, or not use, the evidence at trial was one of strategy. *West*, 187 Ill. 2d at 432. It is clear that defense counsel was aware of the video as he asked Quantarius about the contents of his interview at the trial. There are many reasons why defense counsel may have decided not to use the video. Regardless of the reason, the decision was one for trial counsel to make and, therefore, the allegation is insufficient to rebut the presumption that defense counsel's trial strategy included not using the video.

35

¶ 89     "The only exception to [the trial strategy] rule is when counsel's chosen trial strategy is so unsound that 'counsel entirely fails to conduct any meaningful adversarial testing.' " *Id.* at 432-33 (quoting *People v. Guest*, 166 Ill. 2d 381, 394 (1995)). Here, no such finding can be made. As to Quantarius, defense counsel thoroughly questioned the witness as to his statements in the police interview. Further, despite Quantarius's denial of his interview statements, defense counsel was successful in obtaining Detective Danner's testimony which confirmed Quantarius initially named Bryan, not defendant, as the shooter. Finally, defense counsel repeatedly argued to the jury about Quantarius's lack of credibility due to changing his version of the events and included the fact that Quantarius's sentence was dependent on his testimony. As such, defendant fell short in showing that his counsel failed to conduct any meaningful adversarial testing and, therefore, we deny defendant's claim of ineffective assistance of counsel.

¶ 90                                    D. Defendant's Sentence

¶ 91     Defendant's final argument contends that his 85-year prison sentence is excessive because the judge failed to consider his rehabilitative potential. He contends that the court's failure to consider the factors in mitigation, in conjunction with the objective of restoring an offender to useful citizenship pursuant to the Illinois Constitution, precludes affirmation of his sentence.

¶ 92     A trial court has broad discretion in the imposition of a defendant's sentence. *Patterson*, 217 Ill. 2d at 448. We provide deference to the court's sentence because the trial court was in the best position to consider the defendant's "credibility, demeanor, general moral character, mentality, social environment, habits[,] and age." *People v. O'Neal*, 125 Ill. 2d 291, 298 (1988). We review the court's sentence for an abuse of discretion. *Id.* at 297-98. "[A]n abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

36

¶ 93    Notably, when the imposed sentence falls within the statutorily prescribed range, it will not be found to be excessive or an abuse of discretion "unless the sentence greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 33. While a court must consider the seriousness of the offense along with the potential for rehabilitation, a court is not required to give greater weight to defendant's potential rehabilitation than to the seriousness of the offense. *Id.* ¶ 32. "The seriousness of the offense is one of the most important factors for the court to consider." *Id.*

¶ 94    Defendant concedes the trial court addressed the mitigating factors presented, noting defendant's relatively young age, familial support, education, and employment. However, he contends that the trial court's statement of, "But I don't think anything I can do from my position is going to change things" was an explicit refusal to consider defendant's rehabilitative potential. We disagree. The comment was based on giving a maximum sentence requested by the State and the court stating that it did not agree that handing out long sentences equated with people deciding there would be no more gun violence. As such, defendant's reliance on that statement is unwarranted.

¶ 95    Second, defendant was convicted of first degree murder and attempted first degree murder and was also found to be the shooter of both victims. Based on the jury's convictions and enhancement findings, defendant's minimum sentence was 76 years, which even his attorney argued would leave defendant imprisoned until he was 92 years old and would leave defendant's rehabilitative potential in the hands of the parole board. Although the court did not explicitly address rehabilitative potential, prior to pronouncing the sentence, it specifically stated that it considered the factors in aggravation and mitigation. The sentence imposed was within the

37

statutory guidelines and was significantly lower than the maximum that could have been imposed. The sentence was not at odds with the purpose and spirit of the law. Therefore, we cannot find the trial court abused its discretion by imposing the sentence. Accordingly, we affirm the trial court's sentence.

¶ 96                                III. CONCLUSION

¶ 97     For the above-stated reasons, we affirm defendant's convictions and sentences.


¶ 98     Affirmed.